**Murat ONAL, Plaintiff,**

v.

**BP AMOCO CORPORATION, Defendant.**

No. CIV.A. 01–0286.

United States District Court, E.D. Pennsylvania.

Aug. 6, 2003.

---

**654**

Ronald J. Shaffer, Samuel H. Israel, William H. Stassen, Fox Rothschild O'Brien and Frankel, L.L.P., Philadelphia, PA, for Plaintiff.

Francis X. Taney, Jr., Buchanan Ingersoll PC, Joseph R. Loverdi, William A. De Stefano, Saul Ewing LLP, Philadelphia, PA, for Defendant.

## MEMORANDUM

ROBRENO, District Judge.

Plaintiff Murat Onal brought this breach of contract action against BP Amoco Corporation ("Amoco") in connection with Amoco's alleged breach of a ground lease. Amoco counterclaimed for Onal's alleged breach of the duty of good faith and fair dealing and tortious interference with contractual relations.

After a trial, the jury found in favor of Onal on the breach of contract claim and against Amoco on all counterclaims. The jury awarded Onal $109,999.92 in damages for rent owed by Amoco up until the time of trial, and $28,317.23 for past unpaid taxes. However, the jury awarded Onal no damages for future rents, insurance premiums and taxes from the time of trial until the expiration date of the lease.

Both parties have filed post-trial motions. Amoco attacks the finding of liability on the grounds that it was privileged to terminate the lease based on two separate provisions in the lease. Onal, on the other hand, contests the limited amount of damages awarded on the theory that, under Pennsylvania law, he is entitled to collect, in addition to the damages to the time of trial actually awarded by the jury, rents, taxes and insurance payments that will fall due after trial and continuing until the expiration of the lease. For the reasons that follow, the court will affirm the jury's finding that Amoco was liable for breach of lease, and will also affirm the jury's award to Onal of past damages only in the amount of $138,317.15.

## I. FACTS

In 1992, Murat Onal borrowed money from lender GE Capital, T.T. 9/25/02 (doc. no. 86) at 16, 88, with which to purchase certain real estate located in Bristol, Pennsylvania. T.T. 9/25/02 (doc. no. 86) at 7–8. At the time of the purchase, the property housed a restaurant and a check cashing agency. T.T. 9/25/02 (doc. no. 86) at 7–9.

On December 12, 1996, Onal entered into a ten year Ground Lease ("1996 Ground Lease") with defendant BP Amoco Corporation ("Amoco"). Ex. P–1. Amoco intended to construct a gas station and large convenience store on the premises. T.T. 9/27/02 (doc. no. 88) at 29. Under the terms of the 1996 Ground Lease, Amoco leased from Onal only that portion of the property designated as "Parcel A," on which the restaurant was located. T.T. 9/25/02 (doc. no. 86) at 25. The check cashing agency remained on "Parcel B," the portion of the property not leased to

Amoco. T.T. 9/25/02 (doc. no. 86) at 25; T.T. 9/27/02 (doc. no. 88) at 29, 32. Under the terms of the 1996 Ground Lease for Parcel A, Onal was to receive from Amoco monthly rent in the amount of $4,583.33 for the first five years of the lease. Ground Lease, at ¶ 1. During the second five years of the term, Onal was to receive monthly payments from Amoco in the amount of $5,041.66. Ground Lease, at ¶ 1.

Amoco's duty to pay rent on the property did not, however, commence immediately upon execution of the 1996 Ground Lease. Rather, the parties provided that Amoco would be liable for rents beginning "on the day gasoline [was] first sold ... but in no event later than ninety (90) days subsequent to the date all permits mentioned in Paragraph 6 hereof have been obtained and all provisions of Paragraph 7 have been fulfilled ...." Ground Lease, at ¶ 1. In addition to being responsible for payment of rent, Amoco was to pay the property's taxes and insurance. 1996 Ground Lease, at ¶¶ 5, 7.

Paragraph 6 of the 1996 Ground Lease, referenced in Paragraph 1, required Amoco, at its own cost and expense, to procure "the issuance from the proper municipal, county, state and other duly constituted authorities such unconditional permits ... satisfactory to Lessee" for the improvements and construction necessary to convert the premises into a gas station, convenience store, and car wash. Ground Lease, at ¶ 6. The Ground Lease explicitly provided that Amoco could not be deemed in breach of the lease if it "duly pursue[d]" the necessary permits and "diligently carried out" the proceedings necessary to obtain the permits, but ultimately was unsuccessful. Ground Lease, at ¶ 6.

Paragraph 6 also afforded Amoco the privilege of terminating the lease if it proved "unable to obtain [the necessary] permits ... within six (6) months of the full execution" of the Ground Lease. Amoco was permitted to extend the time in which to obtain the permits for up to three additional months upon paying Onal $3500 for each month that the permitting period was extended. Ground Lease, at ¶ 6.

During the permitting and due diligence periods following the execution of the 1996 Ground Lease, Amoco discovered that the leased property was considerably smaller in size than anticipated, T.T. 9/27/02 (doc. no. 88) at 31–33, and that the actual size of the property made constructing a facility of the size that Amoco had originally intended infeasible. T.T. 9/27/02 (doc. no. 88) at 33–34. Although Amoco redesigned its facility to a size that could fit on a smaller property, it determined that Parcel A alone could not accommodate the redesign, and therefore approached Onal in an attempt to lease Parcel B in addition to Parcel A. T.T. 9/27/02 (doc. no. 88) at 36, 40. For Onal, leasing Parcel B to Amoco necessitated evicting the check cashing station that had been paying rent to Onal since Onal first purchased the property and was then the current tenant. T.T. 9/25/02 (doc. no. 86) at 8–9, 26; T.T. 9/27/02 (doc. no. 88) at 40.

Amoco did not obtain the necessary permits for the property within the six-month Permitting Period established in Paragraph 6, or during either of the two three-month permitting period extensions that Onal granted at its request after Amoco discovered that the property was much smaller than it had anticipated and after it began negotiating with Onal to lease more of his property. T.T. 9/27/02 (doc. no. 88) at 28, 44–46; T.T. 10/2/02 (doc. no. 90) at 9–10.

In order to speed the check cashing agency's eviction, Amoco offered Onal $50,000 as "up front money," which Onal accepted. T.T. 9/27/02 (doc. no. 88) at 49–51. In April 1998 Amoco began paying

Onal rent, notwithstanding that Paragraph 1 of the 1996 Ground Lease provided that Amoco's obligation to pay rent would not take hold until the property was properly permitted. T.T. 9/27/02 (doc. no. 88) at 50; T.T. 10/2/02 (doc. no. 90) at 26. In a lease dated December 10, 1997, Onal, having evicted the check cashing station, leased the entirety of his property, i.e., both Parcel A and Parcel B, to Amoco. Ex. P–13; T.T. 9/25/02 (doc. no. 86) at 26–28.

As it attempted to permit the property, Amoco sent to Onal for his signature mylars containing a final site plan. T.T. 10/2/02 (doc. no. 90) at 13–14. On November 1, 1999 Onal's attorney, William Weiner, responded to this request by letter, and informed Amoco, due to his concerns over whether a formal lease had actually been executed by his client and Amoco, he was "holding" the mylars until the legal issue had been resolved. Ex. P–31. Weiner also stated that "[a]s soon as this lease issue is resolved, I shall have my client execute the foregoing mylars and prints and return them to you for filing." Ex. P–31. Onal ultimately did not sign the mylars, and the property was never permitted for a gas station. T.T. 10/2/02 (doc. no. 90) at 15. Stephen Faletto, Amoco's zoning coordinator, testified that he did not call Weiner or inquire about the mylars after receiving Weiner's letter. T.T. 10/2/02 (doc. no. 90) at 31.

During the permitting period, and even as it attempted to obtain the necessary permits, however, Amoco decided to attempt to assign its lease to Wendy's Corporation, a restaurant chain that was interested in developing the property for use as the location of a fast food restaurant. T.T. 10/2/02 (doc. no. 90) at 10–11, 28. In December 1999, Amoco informed Onal and Weiner, that it was "no longer interested in developing the property as a gas station, and was interested in buying its way out of the lease." T.T. 9/25/02 (doc. no. 86) at 145–46. After buyout negotiations proved unsuccessful by early 2000, Amoco informed Onal of its plans to assign the lease to Wendy's. T.T. 9/25/02 (doc. no. 86) at 150.

The assignment of the lease to Wendy's was complicated by several clouds on Onal's title to the property, and, in particular, by the lien created by the GE Capital loan with which Onal had initially purchased the property T.T. 9/25/02 (doc. no. 86) at 157. Per Wendy's internal policy, the assignment of the lease could not go forward absent Amoco producing a subordination and nondisturbance agreement from Onal that resolved each title issue. T.T. 10/1/02 (doc. no. 89) at 12–17. Moreover, because Wendy's planned to open a restaurant on Onal's property by the end of 2000, it required that title issues be resolved by September 12, 2000, within sixty days of the signing of the assignment from Amoco. T.T. 10/1/02 (doc. no. 89) at 17–18.

In order to obtain the subordination agreement necessary for it to assign its lease to Wendy's, Amoco invoked Paragraph 7 of the 1996 Ground Lease, which provided, in relevant part, that Onal as lessor was obligated "to procure for the inspection of Lessee subordination agreements in form satisfactory to Lessee, duly executed by the owner or owners of such liens." Ground Lease, at ¶ 7. Amoco provided Onal with a form of non-disturbance agreement ("SNDA") that it wanted Onal to sign with respect to the GE Capital lien. T.T. 9/25/02 (doc. no. 86) at 166–67. In turn, on or about August 30, 2000, Onal forwarded the form to Debra Gann, a compliance manager at GE Capital. T.T. 9/25/02 (doc. no. 86) at 167. Along with sending Gann the form, Onal informed Gann that Amoco's form was to be completed no later than September 12, 2000. T.T. 9/25/02 (doc. no. 86) at 167.

At some point during the parties' attempts to secure an SNDA from GE Capital, Jeffrey McCormack ("McCormack") of Amoco started negotiating directly and independently of Onal with Gann over the contents of the SNDA. T.T. 9/25/02 (doc. no. 86) at 171–72. On September 8, 2000, 4 days shy of the September 12 deadline, McCormack sent Gann an email in which he informed her that "it is still undetermined as to whether Wendy's will accept the lease assignment upon the completion of its due diligence." Ex. P–90. McCormack continued, "[i]f Wendy's does go forward with the assignment we will ask you to execute a Non–Disturbance Agreement at that time." Ex. P–90. Attached to the email was Amoco's proposed SNDA agreement. *See* Ex. P–90. Weiner was not copied on the email, and never learned of it until after Amoco terminated its lease with Onal. T.T. 10/2/02 (doc. no. 90) at 47.

With the September 12 deadline fast approaching, concerned that Gann still had not signed Amoco's form SNDA, and unaware of McCormack's September 8 email, Weiner sent his own proposed version of an SNDA to McGann for her signature on September 11, 2000. T.T. 9/25/02 (doc. no. 86) at 181–82. He also sent a copy to McCormack. T.T. 9/25/02 (doc. no. 86) at 189–90.

Wendy's withdrew its interest in the assignment of the lease in October 2000. T.T. 10/1/02 (doc. no. 89) at 22–23. Amoco stopped paying rent as of October 1, 2000. T.T. 9/25/02 (doc. no. 86) at 31. The instant lawsuit was filed on January 18, 2001. The jury returned a verdict on October 4, 2002. The instant post-trial motions followed.

## II. DISCUSSION

### A. *Applicable Standards*

A court may grant a motion for judgment as a matter of law under Rule 50 if it determines that there was "no legally sufficient evidentiary basis for a reasonable jury to have found for a particular party on an issue," and that, without a favorable finding on that issue, the party cannot maintain his claim under controlling law. Fed.R.Civ.P. 50(a)(1). In evaluating whether the evidence introduced was legally sufficient, the court "must view the evidence in the light most favorable to the non-moving party, and determine whether the record contains the 'minimum quantum of evidence from which a jury might reasonably afford relief,'" *Glenn Distribs. Corp. v. Carlisle Plastics, Inc.,* 297 F.3d 294, 299 (3d Cir.2002) (quoting *Mosley v. Wilson,* 102 F.3d 85, 89 (3d Cir.1996)). Moreover, the court is prohibited from "weigh[ing] evidence, determin[ing] the credibility of witnesses [and] substitut[ing] its version of the facts for that of the jury." *Parkway Garage, Inc. v. City of Philadelphia,* 5 F.3d 685, 691 (3d Cir. 1993). Rather, the court may grant judgment as a matter of law only if, "viewing the evidence in the light most favorable to the non-movant and giving it the advantage of every fair and reasonable inference, there is insufficient evidence from which a jury reasonably could find liability." *W.V. Realty, Inc. v. Northern Ins. Co.,* 334 F.3d 306, 311 (3d Cir.2003) (citing *Lightning Lube, Inc. v. Witco Corp.,* 4 F.3d 1153, 1166 (3d Cir.1993)).

On the other hand, a court may in its discretion grant a new trial under Rule 59 when faced with a verdict "contrary to the great weight of the evidence; that is, 'where a miscarriage of justice would result if the verdict were to stand.'" *Pryer v. C.O. 3 Slavic,* 251 F.3d 448, 453 (3d Cir.2001) (quoting *Olefins Trading, Inc. v. Han Yang Chem. Corp.,* 9 F.3d 282, 289 (3d Cir.1993)). If trial error forms the basis of a party's claim to a new trial, the court must determine whether (1) an error was, in fact, made in the course of the trial, and (2) "the error was so prejudicial

that refusal to grant a new trial would be inconsistent with substantial justice." *Farra v. Stanley–Bostitch, Inc.*, 838 F.Supp. 1021, 1026 (E.D.Pa.1993).

## B. *Amoco's Motion for Judgment as a Matter of Law as to Liability for Breach of the Lease*

■ Amoco argues that the court should find, as a matter of law,[1] both (1) that pursuant to Paragraph 6 of the 1996 Ground Lease, Amoco was privileged to terminate it, because Amoco was unable to obtain the permits necessary to construct a gas station on Onal's property, and (2) that Onal himself breached the lease by failing to comply with Paragraph 7, which required that he provide a subordination and nondisturbance agreement in form and substance acceptable to Amoco, and that, therefore, Amoco did not breach the contract by terminating the lease in response. For the reasons that follow, the court does not agree.

1. Although Amoco requests in the alternative a new trial, it asserts no errors in jury instructions or evidentiary rulings, nor does it point to any other basis on which a new trial could be ordered. The only question before the court, therefore, which might warrant a new trial is whether there is sufficient evidence from which a reasonable jury could conclude that Amoco breached its lease with Onal.

2. Onal argues now, as at trial, that Amoco should be foreclosed from arguing that Amoco had a right to terminate the lease under the auspices of Paragraph 6 on the grounds that Amoco failed to specify Paragraph 6 as an affirmative defense in the original and amended answers as required under Rule 8(c), or to reveal the defense in its initial disclosures as required under Rule 26(a). Onal argues that he was "severely prejudiced" by Amoco's "sudden inclusion" of the Paragraph 6 defense at trial, that, had he known of this defense, he "could have conducted discovery specifically aimed at showing that the assertion of such a defense is a pretext ...." Pl.'s Brief in Opp. to Amoco's Post–Trial Motion, at 9. Upon review of the circumstances of this case, and events at trial,

## 1. *Paragraph 6 of the Lease*

a. *The court did not err in submitting to the jury the question of whether Amoco acted in good faith as it sought to obtain the permits required under Paragraph 6.*

■ Citing Paragraph 6 of the 1996 Ground Lease, which states, in relevant part, that "[i]n the event that [Amoco] shall be unable to obtain said permits ... within six (6) months of the full execution of this Lease ... [Amoco] shall have the privilege of terminating this Lease ...." Lease, at ¶ 6, Amoco contends that, because it did not obtain the necessary permits and approvals by the expiration of the permitting period provided for in Paragraph 6, it was, as a matter of law, "justified in terminating the 1996 Ground Lease under the clear and unambiguous provisions of paragraph 6 ...." Mem. of Law in Support of Def.'s Renewed Mot. for J. Pursuant to Fed. R. Civ. P50(sic) at 5.[2]

the court concludes that Onal's argument is without merit.

It is true that Amoco never raised Paragraph 6 as an affirmative defense in its pleadings. However, on November 8, 2001, almost a full year before trial in this matter, Amoco specifically invoked in its cross-motion for summary judgment Paragraph 6's permitting contingency as one reason permitting it to terminate its lease with Onal. *See* Def. BP Amoco Corp.'s Mem. of Law in Opp. to Plaintiff's Mot. for Partial Summ. J. and in Support of Its Cross–Mot. for Summ J. at 21. In fact, in its response, Onal never once contended that the pleadings in the case were deficient, but rather addressed the merits of Amoco's Paragraph 6 defense. *See* Pl. Murat Onal's Resp. in Opp. to Def. BP Amoco Corp.'s Cross–Motion for Summ. J. at 29–30. At trial, Onal contended that he had been ambushed by the Paragraph 6 defense, and objected to the introduction of evidence that supported it, on the grounds that Paragraph 6 had never been mentioned in the pleadings, T.T. 10/2/02 (doc. no. 90) at 6–7. Noting Amoco's argument that the issue had been raised in Amoco's summary judgment motion,

Now, as at trial, Amoco asserts that, because the permits were not obtained, ergo, it had an absolute right to terminate the lease as a matter of "contract interpretation" and "the application of undisputed facts to law," and the question of whether it was privileged to terminate the lease should never have been submitted to the jury for its consideration. *Id.* at 3.

■ Onal, on the other hand, contends that, even though Amoco is right that Amoco was privileged to terminate the lease under the terms of Paragraph 6 if proper permits were not obtained, it is only half-right. This is so, according to Onal, because Amoco's argument that it was privileged to terminate the lease ignores what Pennsylvania law has long recognized, namely that "[e]very contract imposes on each party a duty of good faith and fair dealing in its performance and its enforcement," Restatement (Second) of Contracts § 205; *see also Kaplan v. Cablevision of Pa., Inc.,* 448 Pa.Super. 306, 671 A.2d 716, 721–22 (1996) (citing *Creeger Brick & Bldg. Supply, Inc. v. Mid–State Bank & Trust Co.,* 385 Pa.Super. 30, 560 A.2d 151, 153 (1989) and *Baker v. Lafayette Coll.,* 350 Pa.Super. 68, 504 A.2d 247,

255 (1986)), which requires parties to a contract to avoid "evasion of the spirit of the bargain, lack of diligence and slacking off, willful rendering of imperfect performance, abuse of a power to specify terms, and interference with or failure to cooperate in the other party's performance." *Somers v. Somers,* 418 Pa.Super. 131, 613 A.2d 1211, 1213 (1992) (citing Restatement (Second) of Contracts § 205 cmt. d). In this context, Onal asserts that the fact that one of the parties to a contract has made his obligation to complete the bargained for transaction contingent on his ability to bring about another event is no defense to the duty of good faith and fair dealing, compliance with which is properly a jury question. For the reasons that follow, the court concludes that Onal, rather than Amoco, has advanced the correct view.

*Huang v. BP Amoco Corp.,* 271 F.3d 560 (3d Cir.2001) is instructive in this regard. In *Huang,* the issue before the Third Circuit was whether the district court had erred in granting summary judgment on the issue of whether Amoco, the defendant, had acted in good faith when it sought to terminate a 15–year ground lease on the basis of an approvals contingency clause strikingly similar to the one at issue in the instant case.[3] In evaluating

the court overruled the objection and allowed the evidence to be presented. T.T. 10/2/02 (doc. no. 90) at 7. The issue was again argued at length as the parties made Rule 50 motions, *see* T.T. 10/2/02 (doc. no. 90) at 92–99, at which time the court stood by its prior ruling in favor of allowing the defense to be presented. *See* T.T. 10/2/02 (doc. no. 90) at 99. Plaintiff again objected to the inclusion of the Paragraph 6 defense in the jury instructions, and was overruled. T.T. 10/2/02 (doc. no. 90) at 137–39.

Rule 15(b) provides that "[i]f evidence is objected to at the trial on grounds that it is not within the issues made by the pleadings, the court may allow the pleadings to be amended ...." to conform the pleadings to the evidence so introduced. Fed.R.Civ.P. 15(b). The court may freely grant leave absent prejudice to the party opposing the amendment. *See id.* In this context, the

court considered Amoco's arguments in favor of its Paragraph 6 defense contained in its motion for summary judgment and Onal's argument in response to be the equivalent of a motion to amend the pleadings and Onal's response to that motion. Onal is not prejudiced by reason of the inclusion of the Paragraph 6 defense in this case, as he had almost a year before trial in which to conduct additional discovery on the issue, and also could have requested a continuance of the trial, had he so desired, to meet that defense. Now, as at trial, the court deems that the motion for summary judgment has amended Amoco's answer to state Paragraph 6 of the 1996 Ground Lease as an affirmative defense.

3. The clause provided that "[i]f for any reason [Amoco] has not obtained the [necessary approvals for the property from various government authorities] within six ... months after

this narrow issue, however, the Third Circuit was forced to confront the underlying question of whether an unambiguous approvals contingency clause could give a lessee an absolute right to terminate the lease or whether that right was tempered by the duty of good faith and fair dealing. *See id.* at 564–65. Examining Pennsylvania law, the Third Circuit rejected the idea that contract language alone controlled, and determined that "[b]ecause of the implied covenant of good faith, an approvals contingency clause does not give a lessee an absolute right to terminate the lease without penalty. Rather, the lessee must make a diligent and good-faith effort to obtain the required approvals." *Id.* at 565.

This is so, the Third Circuit reasoned, because "[t]he law has outgrown its primitive stage of formalism when the precise word was the sovereign talisman, and every slip was fatal," *id.* at 564 (quoting *Jamison v. Concepts Plus, Inc.,* 380 Pa.Super. 431, 552 A.2d 265, 269 (1988)), such that "where it is clear that an obligation is within the contemplation of the parties at the time of contracting or is necessary to carry out their intentions, the court will imply [the duty of good faith and fair dealing] even where the contract itself is not ambiguous." *Id.* at 564–65 (quoting *Slater v. Pearle Vision Ctr., Inc.,* 376 Pa.Super. 580, 546 A.2d 676, 679 (1988)); *accord Starr v. O–I Brockway Glass, Inc.,* 432 Pa.Super. 255, 637 A.2d 1371, 1373 (1994) (finding that a contract's language, although unambiguous on its face, "did not make the decision whether the perform the contract solely at [its] *discretion* .... This is not a case where the contract was illusory such that [the defendant] had the unfettered choice of whether to perform and the

absolute, arbitrary right to cancel the agreement without further liability" and stating that a court would "supply a term imposing ... the duty to make 'reasonable efforts' to bring about the transaction").

 Because an absolutist view of approvals contingency clauses has been rejected by the Pennsylvania courts, the question of whether Amoco was privileged to terminate the lease under Paragraph 6 hinges, not on its actual inability to obtain the necessary permits within the permitting period, but rather on whether Amoco made reasonable efforts, i.e., exercised good faith, to fulfill a condition precedent to performance by both parties under the terms of the contract. Given that "[u]nder Pennsylvania law, whether a party has made a good-faith effort is a question of fact," *Huang,* 271 F.3d at 565 (citing *Jamison,* 552 A.2d at 270), the diligence of Amoco's efforts to obtain the necessary permits was a question properly left to the jury in this case.[4]

b. *There was legally sufficient evidence to support a reasonable jury in finding that Amoco had not exercised good faith in its attempts to obtain the permits required under Paragraph 6.*

 Implicit in the jury's determination that Amoco was, liable for breach of contract is its finding that Amoco was not privileged to terminate under Paragraph 6 of the 1996 Ground Lease. The question is, therefore, whether there is legally sufficient evidence to support a reasonable jury's finding that Amoco did not act in good faith, i.e., did not use reasonable ef-

---

the date of execution of this Lease ... then [Amoco] may, at [its] discretion, terminate the Lease ...." *Huang,* 271 F.3d at 563.

4. The jury was fully instructed on the implied duty of good faith and fair dealing. *See* T.T.

10/3/02 (doc. no. 91) at 110. Moreover, the issue of whether Amoco's attempts to obtain the permits were made in good faith was argued by plaintiff to the jury. *See* T.T. 10/3/02 (doc. no. 91) at 61–62.

forts, in obtaining the permits required under Paragraph 6. For the reasons that follow, the court concludes that a reasonable jury could have so concluded.

The reasons for Amoco's failure to obtain the necessary permits to develop the property as a gas station were hotly disputed at trial. On the one hand, Steven Faletto, Amoco's retail development manager and zoning coordinator for the Mid-Atlantic region, insisted that Amoco made a good faith effort to get the necessary permits, T.T. 10/2/02 (doc. no. 90) at 33, and that its pursuit of those permits was effectively foreclosed by a protracted failure on the part of Onal and his attorney to sign the site plans and mylars necessary for Amoco to obtain approval from Bristol Township. T.T. 10/2/02 (doc. no. 90) at 14–15. Faletto testified that, despite the attempted assignment of the lease to Wendy's, it was Amoco's intention to obtain the necessary permits to build a gas station on Onal's property in the event that Wendy's was unable to get the necessary zoning to build a fast food restaurant. T.T. 10/2/02 (doc. no. 90) at 11, 28.

On the other hand, however, both Onal and his real estate attorney offered evidence suggesting Amoco's intent not to go forward with the lease and posited a possible motivation for Amoco's not pursuing the permits in a diligent manner. Onal explained that he ultimately did not sign the mylars and other papers necessary for Amoco to obtain the permits because an official at Amoco told him that it wished to buy out the lease rather than build a gas station as it had originally intended. T.T. 9/25/02 (doc. no. 86) at 66–67. Onal's attorney, William Weiner, testified that Amoco had informed him in that it no longer wished to build a gas station on the property, that it desired to buy out the lease, and later that it was attempting to assign the lease to Wendy's. *See* T.T. 9/25/02 (doc. no. 86) at 145–46, 158.

Indeed, David MacDonald, a Property Development Manager for Amoco during the relevant period, went to great lengths to emphasize Amoco's dissatisfaction with the property, because "the facility that [Amoco] had proposed to put there was almost double the size, double the size of convenience store ... [Amoco was] going to have the future car wash. So, of course, that would be more of an income that we could bring in on that site ... [B]y cutting back the facility and making things smaller, ... sales would go down." *See* T.T. 9/27/02 (doc. no. 88) at 42. The reconfigured proposed facility would be less than half of the size of that originally planned, and MacDonald explained that "as you're driving down the street, it wouldn't have the grandiose appearance that [Amoco was] looking for." T.T. 9/27/02 (doc. no. 88) at 43.

In this context, there was also some evidence that Amoco did not take at least one obvious step to secure Onal's signature on the mylars. Faletto acknowledged that he received a November 1, 1999 letter from Weiner, wherein Weiner stated that he and Onal were holding the mylars pending a determination of what lease was actually in effect between Onal and Amoco, but that, upon resolution of that issue, he would have Onal execute the mylars and prints and return them to Amoco for the filing for a building permit. T.T. 10/2/02 (doc. no. 90) at 31 (referring to Ex. P–31). Faletto then admitted that he himself had never called Weiner back to inquire about the mylars. T.T. 10/2/02 (doc. no. 90) at 31. The court finds that a reasonable jury, taking into account the credibility of the witnesses before it, could have determined from this evidence that Amoco had not diligently pursued the permits for the property because it hoped to escape from its obligation under the lease with Onal. Therefore, Amoco is not entitled to judgment as a matter of law on the grounds

that it was privileged to terminate the lease pursuant to paragraph 6.[5]

### 2. *Paragraph 7 of the Lease*

█ Amoco next contends that it is entitled to judgment as a matter of law under Paragraph 7 of the lease. This is so, according to Amoco, because Onal himself breached the lease by failing to provide, in keeping with the allegedly unambiguous requirements of Paragraph 7 a non-disturbance agreement "in form and substance acceptable to Amoco." Ground Lease at ¶ 7. To Amoco's contention and its unreserved reliance on the language of the lease as a basis for its assertion that it is entitled to judgment as a matter of law, Onal offers three counter-arguments, namely that (1) there was legally sufficient evidence introduced at trial to indicate that Onal in fact had provided an SNDA agreement in form and substance acceptable to Amoco, in that he provided to Amoco and Wendy's by September 12, 2000, an SNDA agreement whose legal effect was that which Amoco sought, (2) Onal, in any event, had no duty to supply an SNDA in form and substance acceptable to Amoco because Amoco had failed to obtain proper permits for the property, and thus had failed, under the terms of the Lease, to trigger Onal's duty to act, and (3) there was legally sufficient evidence for the jury to conclude that Amoco materially interfered with Mr. Onal's ability to provide a signed SNDA. For the reasons that follow, the court concludes, examining each argument seriatim, that any of these three bases could support a jury's finding in this

case that Onal's failure to provide an SNDA in form and substance acceptable to Amoco did not constitute a breach of the lease on his part.

### a. *There was legally sufficient evidence from which a jury could have determined that Onal provided an SNDA in form and substance reasonably acceptable to Amoco.*

█ Amoco first argues that Onal breached the lease by failing to provide, in keeping with the requirements of Paragraph 7, "a non-disturbance agreement in form and substance acceptable to [Amoco]." Ground Lease, at ¶ 7. To this end, Amoco emphasizes that it provided Onal with an acceptable form SNDA, that Onal never persuaded his lender, GE Capital, to sign off on the form that Amoco had provided, and that Onal instead presented GE Capital with a SNDA that he had drafted without consultation with Amoco, and, therefore, without Amoco's prior approval of its terms. Amoco contends that Onal's conduct constituted a total breach of the lease, for which Amoco was entitled to terminate the lease by refusing to make rental payments as promised. In other words, Amoco contends that because Onal breached first, as a matter of law, Amoco cannot now be held liable for walking away in response. For the reasons that follow, the court does not agree.

The Restatement (Second) of Contracts explicitly contemplates situations such as this one, i.e., where an obligor has conditioned his duty to perform under a contract on his satisfaction with an obligee's

---

**5.** Amoco also asserts that, as a matter of law, its voluntary rental payments to Onal did not constitute a waiver of its power to terminate under Paragraph 6 when it failed to obtain permits for the property. Whatever the merit of Amoco's legal argument, a determination of this issue in Amoco's favor does not change the outcome of this case. Even if Amoco did not waive its power to terminate by beginning

to pay rent, the jury could have found, backed by legally sufficient evidence, that Amoco violated its duty of good faith and fair dealing with respect to its attempting to obtain the permits. *See* discussion, *supra*. This is the same result that would obtain if Amoco had waived its ability to terminate under Paragraph 6 when it began paying rent.

performance. It is true, of course, that "if [an] agreement leaves no doubt that it is only honest satisfaction is meant and no more, it will be so interpreted, and the condition does not occur if the obligor is honestly, even though unreasonably, dissatisfied." Restatement (Second) of Contracts § 228 cmt. a. In such cases, "the exercise of judgment must be in accordance with the duty of good faith and fair dealing .... " *Id.; see also Kramer v. Philadelphia Leather Goods Corp.*, 364 Pa. 531, 73 A.2d 385, 387 (1950) (finding that "a question of fact was ... presented whether defendant's dissatisfaction was genuine or was prompted by caprice or bad faith").

However, the Restatement also provides that "[w]hen ... it is practicable to determine whether a reasonable person in the position of the obligor would be satisfied, an interpretation is preferred under which the condition occurs if such a reasonable person in the position of the obligor would be satisfied." Restatement (Second) of Contracts § 228; *see also id.* cmt. b ("When ... the agreement does not make it clear that it requires merely honest satisfaction, it will not usually be supposed that the obligee has assumed the risk of an obligor's unreasonable, even if honest, dissatisfaction."). Such is the case here.

Paragraph 7 requires Onal to provide a "non-disturbance agreement in form and substance acceptable to Amoco." Ground Lease, at ¶ 7. Under a plain meaning read-ing, this phrase does not clearly condition Amoco's duty to perform under the lease on its honest satisfaction with the SNDA provided by Onal. It does not, for example, specify that the SNDA supplied by the landlord be presented only on an Amoco-issued form, or adhere to any particular linguistic formulation. Rather, Amoco was bargaining merely for a legally enforceable document, supplied by the landlord, that would insure that its tenancy on his land would not be disturbed by actions by GE Capital, the lender. As such, Amoco's "satisfaction" with the SNDA ultimately provided by Onal is subject to objective measure.

The jury in this case was presented with evidence that the SNDA timely provided by Onal to GE Capital and Amoco on September 11, 2000, a day before the September 12 deadline, was in form and substance acceptable within the meaning of the contract, despite Amoco's protestations that it was subjectively dissatisfied with the document. Stuart Ebby, a practicing attorney specializing in real estate transactions, testified as an expert witness on behalf of Onal and with respect to the form of SNDA agreement that he submitted to Gann. Comparing the language of the non-disturbance agreement provided by Amoco to that contained in the non-disturbance agreement prepared by Onal and presented to Gann for her signature, *see* T.T. 9/26/02 (doc. no. 87) at 132–35; Ex. P–90; Ex. P–92.[6] Ebby concluded that the agree-

---

**6.** Amoco suggested the following language:

> In the event the Prime Mortgage is foreclosed during the term of the Prime Lease, Prime Mortgagee shall foreclose ... subject to Tenant's interest in the Prime Lease ... In the event Prime Mortgagee ... comes into possession as a result of an action in lieu of a foreclosure sale during the term of the Prime Lease, Prime Mortgagee ... shall recognize the Prime Lease as being in full force ....

P–90, at § 2. On the other hand, Onal's proposed SNDA contained the following language:

> Tenant's right of possession of the Premises and any and all of Tenant's other rights under the Lease shall not be affected in any way or disturbed by Lender in the exercise of any of its rights under the Mortgage or any of the related loan documents or any judgement (sic) thereon or any exercise of any right under this Agreement, or any exercise of any power of sale or any other right provided by law, nor shall Tenant be

ment drafted by Onal "means exactly what I just read to you from [Amoco's proposed] agreement, and that is that if the landlord goes into default and if the lender forecloses, it will not evict the tenant." T.T. 9/26/02 (doc. no. 87) at 135. Ebby opined that although the two agreements were "written somewhat differently and ... in both cases they give the tenant the one thing the tenant must have, which is the bank's agreement not to evict the tenant, and it's there. It's in both agreements." T.T. 9/26/02 (doc. no. 87) at 136.

Given that its main complaint is that Onal's proposed SNDA does not refer explicitly to both the 1996 and 1997 leases, but rather refers to "a certain lease agreement dated December 12, 1996 ... if amended, with all amendments thereto, hereinafter called the 'Lease' ...." Ex. P–92, Amoco points out that, on cross examination Ebby opined that an SNDA meant to cover two different parcels covered by two different leases would be insufficient if it referred to only one of the leases, T.T. 9/26/02 (doc. no. 87) at 148. However, on redirect, Ebby set forth one circumstance, factually akin to the one presented in this case, in which an SNDA referring to only one parcel would be, in practical effect, sufficient to prevent a lender from disturbing another parcel subject to a different lease:

> Q: Let's say hypothetically a tenant builds a building like this.
> A: Okay. It's partly on [Parcel] A and partly on [Parcel] B.
> Q: Partly on A and partly on B. And let's assume hypothetically there's only a non-disturbance agreement as to this particular parcel. Could they disturb the tenant from [the other] parcel?
> A: No.

named as a party defendant in any action by Lender under the Mortgage for the purpose of terminating the Lease ... nor shall Tenant, by any action or judgment, be in

T.T. 9/26/02 (doc. no. 87) at 150. Therefore, Ebby's expert testimony, if credited by the jury, could constitute the basis for a jury finding that Onal on September 11, 2000 provided an SNDA agreement that was, in fact, in form and substance satisfactory to Amoco under the terms of the contract between them.

b. *The jury could have found that Onal was not obligated to provide an SNDA under Paragraph 7 because Amoco had not obtained the necessary permits under Paragraph 6.*

Onal next points out that, even if the jury found, notwithstanding Ebby's testimony, that Onal had not provided an SNDA in form and substance acceptable to Amoco, it also could have found that Onal was never obligated to provide such an agreement in the first place. Under the clear language of Paragraph 7 of the 1996 Ground Lease, "[w]hen all permits mentioned in Paragraph 6 hereof have been obtained to Lessee's satisfaction ... Lessor agrees to procure for the inspection of Lessee subordination agreements ... or a non-disturbance agreement in form and substance acceptable to Lessee ...." 1996 Ground Lease, at ¶ 7. In this context, and, given the undisputed fact that Amoco never obtained the Paragraph 6 permits, Onal argues that the jury could have determined that Onal's duty to provide the SNDA was, in fact, never triggered under the plain terms of the lease.

 Amoco's only argument in response is that the doctrine of "judicial estoppel" bars Onal from asserting both that Onal was not required to provide an SNDA pursuant to Paragraph 7 of the lease because Amoco had not obtained the

any other way foreclosed from its rights under the lease.
Ex. P–92, at ¶ 3(a).

necessary permits under paragraph 6, and that Amoco waived the Paragraph 6 permitting contingency when it began paying rent. For the reasons that follow, the court does not agree.

 Judicial estoppel is an equitable doctrine by which a court may "prevent a litigant from asserting a position inconsistent with one that [he] has previously asserted in the same or in a previous proceeding." *Ryan Operations G.P. v. Santiam–Midwest Lumber Co.*, 81 F.3d 355, 358 (3d Cir.1996). Equitable estoppel is a doctrine of discretion, and is applicable when necessary to "(1) to preserve the integrity of the judicial system by preventing parties from playing fast and loose with the courts in assuming inconsistent positions, and (2) with a recognition that each case must be decided upon its own particular facts and circumstances." *McNemar v. Disney Store, Inc.*, 91 F.3d 610, 617 (3d Cir.1996).[7]

In this case, Amoco's claim that judicial estoppel should apply fails at the threshold. The Third Circuit has held that "judicial estoppel is inappropriate unless the earlier [asserted] position was adopted by a court or agency," *Montrose Med. Group Participating Savings Plan v. Bulger*, 243 F.3d 773, 782 (3d Cir.2001), such that a litigant's merely "asserting inconsistent claims within a single action obviously does not constitute misconduct that threatens the court's integrity." *Id.* In this case, the court never endorsed either one of Onal's potentially inconsistent theories in any way, but rather has allowed the jury, upon hearing all the evidence in this case, to choose between them. Therefore, judicial

estoppel may not foreclose Onal from arguing that Onal's duties under Paragraph 7 were not triggered because Amoco failed to obtain the necessary permits under Paragraph 6, and the court did not err in allowing Onal to place that argument to the jury for its consideration. Moreover, a reasonable jury could have found, based on the undisputed fact that Amoco never obtained the permits required under Paragraph 6, that Onal's duties under Paragraph 7 were never triggered, and that he therefore did not commit a breach of the lease by failing to provide an SNDA in form and substance acceptable to Amoco.

c. *There was legally sufficient evidence from which a jury could have found that Amoco materially interfered with Onal's ability to provide an SNDA.*

 Onal also points out, and the court agrees, that, even if the jury found that Onal's obligation to provide an SNDA in form and substance acceptable to Amoco was triggered under the lease, and that Onal did not comply with that requirement, there was still legally sufficient evidence from which the jury could have concluded that Onal's failure to provide an acceptable SNDA was excused by reason of Amoco's interference with Onal's performance under the lease. This is so because, even assuming that the lease in this case was just as unambiguous in terms of the kind of performance required as Amoco asserts, it is still true that "[c]onduct of one party that prevents the other from performing is an excuse for nonperformance." *Liddle v. Scholze*, 768 A.2d 1183,

---

7. While it is sweeping in theory, in practical effect, judicial estoppel is limited to those situations in which (1) the party has taken two irreconcilably inconsistent positions, (2) the party has changed his position "in bad faith-i.e., with intent to play fast and loose with the court," and (3) estoppel would be "tailored to address the harm identified, and no lesser sanction would adequately remedy the damage done by the litigant's misconduct." *Krystal Cadillac–Oldsmobile GMC Truck, Inc. v. Gen. Motors Corp.*, 337 F.3d 314, 319 (3d Cir.2003) (citing and quoting *Montrose Med. Group Participating Savings Plan*, 243 F.3d at 779).

1185 (Pa.Super.2001); *see also Rainier v. Champion Container Co.*, 294 F.2d 96, 103 (3d Cir.1961) (describing as "well settled" the proposition that "where one party to a contract is himself the cause of a failure of performance by the other party, he cannot advantageously use his own fault as an exit of escape from the performance of his contractual obligations."). Indeed, the jury was specifically instructed to this effect with specific reference to Onal's obligations under Paragraph 7 of the 1996 Ground Lease. T.T. 10/3/02 (doc. no. 91) at 107–08.

The key piece of evidence in this regard is Jeffrey McCormack's September 8, 2000 email, in which he informed GE Capital's Debra Gann that whether the lease would be successfully assigned to Wendy's was "undetermined" and that "[i]f Wendy's does go forward with the assignment [Amoco] will ask [GE Capital] to execute a Non–Disturbance Agreement *at that time*." Ex. P–90 (emphasis supplied). A reasonable jury could have concluded, especially given that Onal's attorney was not copied on this email, T.T. 10/2/02 (doc. no. 90) at 47, that McCormack's communication to Gann had the intended effect of preventing GE Capital, absent contrary instructions from Amoco, from signing any non-disturbance agreement, regardless of the acceptability of its form and substance.

Amoco's subsequent conduct provides further support for this interpretation of the McCormack email. McCormack testified that on October 3, 2003, even when Wendy's informed Amoco that it had still not received an approved and final SNDA and that the assignment of the lease was in danger, McCormack did not contact Gann and ask her to sign any form SNDA to save the assignment of the lease. T.T. 10/1/02 (doc. no. 89) at 115–17. A reasonable jury also could have noted that, in contrast with McCormack's inaction, Weiner created his own proposed SNDA, and sent it to both GE Capital and McCormack, in an effort to comply with the September 12 deadline. T.T. 9/25/02 (doc. no. 86) at 181–82. Of course, such an effort would be fruitless in a context in which Gann had been instructed not to sign any SNDA, even one that, in the final analysis, would have been substantively acceptable to Amoco, absent Amoco's direction to do so.

After examination of the McCormack email and surrounding testimony, the court concludes that there is legally sufficient evidence from which a reasonable jury could have determined that Amoco's actions prevented Onal from providing an SNDA signed by GE Capital in this case, and that his obligation to do so under the 1996 Ground Lease was excused by reason of Amoco's interference. Therefore, the court concludes that the liability verdict against Amoco must stand,[8] and Amoco's

---

8. The court notes that in its post-trial motion, Amoco argues that it is entitled to judgment as a matter of law on "Mr. Onal's equitable estoppel claim." Mem. of Law in Support of Def.'s Renewed Mot. for J. Pursuant to Fed. R.Civ.P. 50 at 12–14. This argument is moot. It is true that in Count II of the Complaint, Onal argued that Amoco should be equitably estopped from arguing that Onal breached the lease by failing to provide a proper SNDA because Amoco, through its silence with respect to the SNDA submitted by Onal, induced him to take no further steps to secure an acceptable SNDA. Whether the jury should receive an instruction or a verdict sheet containing this defense was an issue much discussed at the charge conference, *see* T.T. 10/2/03 (doc. no. 90) 79–93; 123–24, 133–37, but, in the final analysis, the court did not instruct the jury as to equitable estoppel, nor was this claim argued to the jury. Indeed, with respect to the general verdict sheet, which, contrary to the plaintiff's request, contained no mention of an equitable estoppel, plaintiff's counsel observed that when the verdict sheet asked whether the jury found in favor of plaintiff or defendant on "plaintiff's claim against the defendant," his own under-

motion for judgment as a matter of law, or, in the alternative, for a new trial, will be denied in its entirety.

### C. Onal's Motion for Judgment as a Matter of Law as to Damages

The jury awarded Onal $109,999.92 in past rentals and $28,317.23 in taxes that had accrued from the time of the breach to the time of trial. No damages were awarded for future rents or other charges.

Onal contends that he is entitled as a matter of law to an award of future rents equal to the amount of the payments due until the expiration of the lease. Consequently, since Onal's claim to entitlement is a legal one, Onal contends that it was error to submit the question of future rents to the jury. In the alternative, Onal claims that, if submitted to the jury, the jury should have been instructed, as requested, that Onal had no duty to mitigate damages (i.e., to attempt to re-let the property), and, therefore, the jury award must be vacated and the matter resubmitted to a properly instructed jury.

Both contentions asserted by Onal raise in general the issue, under Pennsylvania law, of what remedies are available to a landlord after a material breach by a tenant under a commercial lease. Specifically, in this context, Onal's contentions implicate whether a landlord may recover future rents (and other charges) not yet due as of the time of trial but which will become due and payable during the remainder of the unexpired balance of the lease in a lump sum, regardless of whether the lease in question contains an acceleration clause.

In order to answer this question, the court must consider (1) whether the landlord must be and remain out of possession of the property in order to collect future rents, and (2) whether a landlord's ability to collect future rents in a lump sum depends entirely on the inclusion of an acceleration clause within the lease. Lastly, the court must determine what role, if any, the absence of a duty on the landlord to mitigate damages under Pennsylvania law plays in determining whether the landlord is entitled to a lump sum recovery of future rents.

Courts and commentators have found the interplay of these issues "complex," *Stonehedge Square Ltd. P'ship v. Movie Merchants, Inc.*, 454 Pa.Super. 468, 685 A.2d 1019, 1025–26 (1996), and "confus[ing]." Stephanie Flynn, *Duty to Mitigate Damages Upon a Tenant's Abandonment*, 34 Real Prop. Prob. & Tr. J. 721, 722 (2000). In reconciling these principles, courts have taken varying approaches depending on whether leases are analyzed under contract or real estate principles. Some courts have sought guidance in tracing the historical development of leases from instruments of conveyance of real estate to their more modern use as contracts for personal property. *See, e.g., Stonehedge Square Ltd. P'ship v. Movie Merchants, Inc.*, 552 Pa. 412, 715 A.2d 1082 (1998). Others have focused on whether the covenants in the lease are dependent or independent. *See, e.g., Christian v. Sylvest*, No. CIV. 809/1994, 1995 WL 504929, at *2–3 (Terr.V.I. Aug. 23, 1995) (citing Restatement (Second) of Contracts § 243). Based on an examination of the historical development of leases, the Pennsylvania Supreme Court has concluded, depending on the circumstances, that "leases have a dual nature, both as conveyances of protected property interests and as contracts," *Stonehedge*, 715

standing was that the question was "for the breach of the lease, the fact that they walked away." T.T. 10/3/02 (doc. no. 91) at 63. As such, equitable estoppel could not have provided a basis for the jury's finding in Onal's favor, and, therefore, does not afford a basis on which Amoco may now obtain relief.

A.2d at 1083, and that therefore "problems in leases may be resolved either by principles of property law or by principles of contract law." *Id.* For example, the implied warranty of habitability in a lease is a creature of contract law. *Id.* at 1084 (citing *Pugh v. Holmes,* 486 Pa. 272, 405 A.2d 897, 903 (1979)). By contrast, the existence of a landlord's duty to mitigate damages upon breach of lease has its antecedent in real property law. *Id.* at 1083–84.

■ In Pennsylvania, it is the general rule that "upon breach of a material condition in a commercial lease a landlord must elect *between* repossession and actual damages *or* acceleration of the balance due." *Finkle v. Gulf & Western Mfg. Co.,* 744 F.2d 1015, 1021 (3d Cir.1984) (citing *H.A. Steen Indus., Inc. v. Richer Communications, Inc.,* 226 Pa.Super. 219, 314 A.2d 319, 321–22 (1973)); *see also Nine Penn Ctr. Assocs., L.P. v. Coffees of the World Corp.,* No. 3249, CONTROL 092065, 2002 WL 372954, at *2 (Pa.Com.Pl. Jan. 28, 2002) (citing *Homart Dev. Co. v. Sgrenci,* 443 Pa.Super. 538, 662 A.2d 1092, 1101 (1995) for the proposition that "Pennsylvania prohibits a landlord from confessing judgment both for possession and all monies then due *and* for all monies due for the entire term"). This rule prevents a non-breaching lessor from obtaining the "double recapture" that would result from a rule allowing a landlord to possess the property, and possibly reap a profit from renting or selling it, at the same time that he collects rent from a breaching tenant. *See Finkle,* 744 F.2d at 1022–23; *see also Pierce v. Hoffstot,* 211 Pa.Super. 380, 236 A.2d 828, 830 (1967) ("The tenant, then, does not forfeit [a]ll of his rights when the landlord accelerates, but must thereafter be accorded his possessory rights on payment of the accelerated rent.").

■ If a landlord remains out of possession, however, he may receive a lump sum all rents that will fall due during the unexpired term of his lease, only if the lease in question contains an acceleration clause; otherwise he may recover future rents on the property only as they become due. *See Pierce,* 236 A.2d at 830 ("The acceleration clause is … a guarantee to the lessor that he will receive immediately all of the monies (or other compensation) to which he is entitled under the lease without having to harass a reluctant tenant as periodical payments become due."); *see also Moretti v. Zanfino,* 127 Pa.Super. 286, 193 A. 106, 108 (1937) ("On the happening of the contingency provided for, the rent that was theretofore payable by installments becomes immediately due as provided in the lease."). With these principles in mind, the court turns to an examination of the case at bar.

1. *Amoco has failed to meet its burden of proving that Onal has repossessed the property.*

■ A surrender occurs "when the tenant voluntarily gives up possession of the premises prior to the full term of the lease and the landlord accepts possession with intent that the lease be terminated." Black's Law Dictionary, 1444 (6th ed.1990); *see also In re Allegheny Int'l, Inc.,* 136 B.R. 396, 404 (Bankr.W.D.Pa.1991) (citing *Lawton v. DeAngelo,* 169 Pa.Super. 380, 82 A.2d 900 (1951)) ("Pennsylvania law has defined surrender as the giving up of an estate to the person who has it in reversion or remainder or the giving up of a lease before its expiration."). An act of surrender has the effect of relieving the tenant's obligation to pay rent during the unexpired term of the lease, but only if the landlord accepts the surrender. *Stonehedge,* 685 A.2d at 1023.

■ "[T]he abandonment of possession by the lessee must be accepted by the lessor either expressly such as by written or by oral statements, or impliedly by ac-

tions which are inconsistent with the continuation of the tenant's rights in the leased premises." *In re Hoffman's Estate,* 1969 WL 7687, 47 Pa. D. & C.2d 32, 33 (Pa.Com.Pl.1969). In order for a landlord's actions to indicate his acceptance of the tenant's surrender, those actions must amount to a more serious interference with the tenant's rights than actions taken for the protection of the property during the tenant's absence; rather, the landlord's actions must be "adverse to a reoccupation of [the property] by [the tenant] and [to] a renewal of the relations created by the lease." *Stonehedge,* 685 A.2d at 1023 (quoting *Kahn v. Bancamerica–Blair Corp.,* 327 Pa. 209, 193 A. 905, 907 (1937)).

 At all times, "[t]he burden is on the tenant to show by clear and convincing evidence that the landlord's actions constituted acceptance of the tenant's surrender." *In re Blatstein,* No. Civ. A. 97-3739, 1997 WL 560119, at *10 (E.D.Pa. Aug. 26, 1997) (Padova, J.). Whether a landlord accepts a tenant's surrender requires a determination of the landlord's intent, and, as such, is ultimately a question of fact for the jury. *Id.* (citing *Brill v. Haifetz,* 158 Pa.Super. 158, 44 A.2d 311, 313 (1945)).

Against this background, Amoco contends that Onal accepted its surrender of the property, and that its duty to pay rents was concomitantly discharged, on the theory that Onal's actions in listing the property for rent on several occasions was tantamount to his repossessing it from Amoco, i.e., to his taking a position adverse to a reoccupation of the property by Amoco and inconsistent with a potential renewal of their landlord-tenant relationship. Amoco's best proof that Onal accepted its surrender and took possession of the instant property consists of Onal's attorney's testimony that, as of the time of trial, he was assisting Onal in efforts to lease the property to another tenant in the wake of

Amoco's breach of the lease. T.T. 9/26/02 (doc. no. 87) at 16. Weiner reported that these attempts had been unsuccessful, notwithstanding the fact that he had used four different realtors in the endeavor. T.T. 9/26/02 (doc. no. 87) at 16.

As an initial matter, the court notes that the mere act of listing the property for rent, without actually re-letting it to a tenant, in no way interferes with Amoco's possessory rights and access to the property, and, as a matter of law, is unlikely to constitute an acceptance of Amoco's surrender. *Cf. Stonehedge,* 685 A.2d at 1023 (finding no acceptance of surrender where tenant could still enter the abandoned property through a side door, notwithstanding the fact that landlord had changed some locks, and had stored some removable items in the vacated premises). Even if it did, however, the evidence offered by Amoco falls far short of constituting clear and convincing proof that Onal accepted Amoco's surrender of the property for the simple reason that no testimony fixes Onal's alleged acceptance of surrender in time. As such, there is no legally sufficient evidence from which the jury could determine a date certain at which Onal took possession of the property and thus extinguished Amoco's duty to pay him rent. Therefore, a reasonable jury could not, on the evidence evinced by Amoco, establish the amount of the actual damages that Onal had suffered up until that time. Given Amoco's failure to meet its burden of proof, the court must conclude that Onal did not elect to repossess the property.

2. *Onal may not recover future rents accruing until the expiration of the lease because the lease lacks an acceleration clause.*

 Given that Amoco has failed to sustain its burden of proving that Onal accepted its surrender by taking possession of the property, the court must determine whether he may now recover all past

and future rents in a lump sum, or whether he is limited to suing Amoco for unpaid rent only as it falls due. The fact that the lease in question does not contain an acceleration clause is dispositive of the issue. As noted above, absent an acceleration clause, a Pennsylvania landlord, provided that he remains out of possession, may collect rents only in installments as they accrue. *See Pierce v. Hoffstot,* 211 Pa.Super. 380, 236 A.2d 828, 830 (1967) ("The acceleration clause is … a guarantee to the lessor that he will receive immediately all of the monies (or other compensation) to which he is entitled under the lease without having to harass a reluctant tenant as periodical payments become due."); *see also Moretti v. Zanfino,* 127 Pa.Super. 286, 193 A. 106, 108 (1937) ("On the happening of the contingency provided for, the rent that was theretofore payable by installments becomes immediately due as provided in the lease."). Therefore, Onal is entitled to collect only those rents and other payments that had accrued under the lease as of the time of trial. Because the jury awarded those amounts, and no future rents, the verdict must be affirmed.

▮▮▮▮▮▮ Onal, however, suggests that, because Pennsylvania law imposes on a landlord no duty to mitigate his damages, *Stonehedge Square Ltd. P'ship v. Movie Merchants, Inc.,* 552 Pa. 412, 715 A.2d

1082, 1084 (1998), he is entitled to collect all rents up front, with or without possession, notwithstanding the fact that the lease in question does not contain an acceleration clause. Onal misapprehends the import of the Pennsylvania rule. Rather, the rule relieves the landlord only of a duty to seek a replacement tenant whose rental payments would apply as a credit or a set-off toward the obligation of the breaching tenant under the lease. *See id.* at 1085 (explaining that to require the landlord to mitigate would promote litigation and shift the burden of finding an assignee for the tenant who has breached to the landlord). Contrary to Onal's argument, the non-mitigation rule does not abrogate the long standing Pennsylvania rule that prohibits double recovery, *see Finkle v. Gulf & Western Mfg. Co.,* 744 F.2d 1015, 1021–23 (3d Cir.1984); discussion, *supra* Part III.C., or that require the presence of an acceleration clause in the lease to demand payment of future rents in one lump sum. *See Pierce,* 236 A.2d at 830; discussion *supra* Part III.C.2.[9]

Onal also argues that, under the principles of contract, he is entitled to damages for total breach, and that an acceleration clause is not necessary to bring about a lump sum recovery.[10] This is so, according to Onal, because, given that a tenant's obligation to pay rent is arguably contin-

---

**9.** *Stonehedge* does not purport to disturb the principle that a landlord must choose between taking possession of the property and collecting future rents. Indeed, a landlord's choice between possession with the right to collect actual damages and the right to collect rents on the property remains firmly in place under the non-mitigation rule. The landlord must select among (1) terminating the tenant's lease by accepting the tenant's surrender of the premises and therefore discharging the tenant of its obligation to pay rent, *see Stonehedge Square Ltd. P'ship v. Movie Merchants, Inc.,* 454 Pa.Super. 468, 685 A.2d 1019, 1023 (1996) (discussing effect of surrender), (2) allowing the premises to remain vacant and continuing to collect rent from the breaching

tenant for the remainder of the lease term, *cf., e.g., Pierce,* 236 A.2d at 830, and (3) accelerating the rent, if the lease so provides, taking possession and re-letting the premises with a credit to the tenant in the amount of rent paid by the replacement tenant. *See, e.g., H. A. Steen Indus., Inc. v. Richer Communications, Inc.,* 226 Pa.Super. 219, 314 A.2d 319 (1973).

**10.** In relevant part, the Restatement provides that when performances are "exchanged under an exchange of promises, a breach by non-performance gives rise to a claim for damages for total breach only if it discharges the injured party's remaining duties to render such performance …." Restatement (Second) of Contracts § 243(1). In such an in-

gent on his landlord's compliance with certain property covenants and vice versa, a lease may properly be characterized as a bilateral exchange of promises, and the breach of such a contract gives rise to damages for total breach.

Pennsylvania, however, has refused to incorporate contract principles wholesale into the area of leases and real property. Rather, the Pennsylvania courts have endorsed an approach whereby, based on the circumstances of a particular case, they may discriminately select what principles of contract, as opposed to property, law apply in a given case. *See id.* at 1083 ("Because of their historical background in which leases are sometimes viewed as conveyances of contract and sometimes as contracts, problems in leases may be resolved either by principles of property law or by principles of contract law."). Indeed, in *Stonehedge* itself, for example, the Pennsylvania Supreme Court declined to replace the common law non-mitigation rule, based in property law, with the more modern contract-based view that a lease constituted an exchange of promises such that a landlord was required to mitigate damages, even as it noted that "certain [other] aspects of leases are controlled by the law of contracts . . . ." *Id.* at 1083–84. The Pennsylvania Supreme Court's decision to affirm the property law rule of non-mitigation was grounded in issue-specific practical and policy considerations.[11] Given this recent affirmation of property law principles in Pennsylvania law, and the unchallenged line of cases that apply prop-

erty law principles to require a landlord to choose between possession and rents, the court declines to endorse a purely contractual view of leases as is now urged by Onal. To do so would effectively turn Pennsylvania law upside down. Should a landlord wish to protect its right to a lump sum payment of rents after breach, the landlord is free to bargain for the inclusion of an acceleration clause in the lease.

In this context, the court concludes that, because the 1996 Ground Lease contains no acceleration clause, Onal's post-trial motion for judgment as a matter of law in the amount of future rentals and other payments will be denied. Similarly, because the nonmitigation rule is not relevant to whether a landlord is entitled to collect rents, the court's refusal to instruct the jury with respect to the rule did not constitute error, and does not warrant the granting of a new trial on damages.

## III. CONCLUSION

For the foregoing reasons, Amoco's post-trial motion with respect to the jury's finding of liability for breach of contract will be denied. Onal's post-trial motion seeking the award of future damages will also be denied.

An appropriate order follows.

### ORDER

**AND NOW**, this **6th** day of **August, 2003**, it is hereby **ORDERED** as follows:

1. Plaintiff Murat Onal's Post–Trial Motion Seeking Judgment as a Matter of Law (doc. no. 78) is **DENIED**.

stance, "a breach by nonperformance accompanied or followed by a repudiation gives rise to a claim for damages for total breach." Restatement (Second) of Contracts § 243(2).

**11.** In reaching its decision, the Pennsylvania Supreme Court considered that (1) leases had been drafted and bargained for in reliance on the common law rule of non-mitigation, (2) the potential complexity, expense and delay

that would accompany a mitigation rule was "unwelcome" in Pennsylvania, (3) modern statutory changes had not modified the nonmitigation rule, (4) there was fundamental unfairness in placing on the nonbreaching landlord the burden of mitigating damages for the benefit of the breaching tenant, and (5) the tenant under the circumstances in *Stonehedge* was in a position to mitigate his own damages. *Stonehedge*, 715 A.2d at 1084–85.

2. Plaintiff Murat Onal's Post–Trial Motion Seeking Miscellaneous Relief (doc. no. 78) is **DENIED.**

3. Plaintiff Murat Onal's Post–Trial Motion for a New Trial (doc. no. 78) is **DENIED.**

4. Defendant's Renewed Motion for Judgment Pursuant to Fed.R.Civ.P. 50(b) (doc. no. 80) is **DENIED.**

**IT IS FURTHER ORDERED** that Plaintiff Murat Onal's Post–Trial Motion to Mold the Verdict against BP Amoco to Include Pre–Judgment and Post–Judgment Interest (doc. no. 79) is **GRANTED.**[1]

**AND IT IS SO ORDERED.**

---

1. Although Amoco has acknowledged Onal's entitlement to receive post-judgment interest on the damage award in this case, Amoco has challenged Onal's entitlement to pre-judgment interest on the theory that use of a general verdict sheet makes it impossible to determine whether breach of contract, as opposed to considerations of equitable estoppel, served as a basis for the award. This argument has no merit, because, as noted in the court's memorandum of even date, no equita-ble estoppel claim was presented to the jury in this case, and Onal's breach of contract claim was the only claim considered. *See* Mem. Op. at n. 8. Therefore, Onal may collect pre-judgment and post-judgment interest on the award that he received for Amoco's breach of contract. The court retains jurisdiction to liquidate the specific amount, which will be calculated at the conclusion of this litigation, including possible appeals.